UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| MIRROR METALS, INC., | : | |
| Plaintiff, | : | |
| v. | : | Court No. 21-00144 |
| UNITED STATES, | : | |
| Defendant. | : | |

**COMPLAINT**

Plaintiff Mirror Metals Inc. ("Mirror Metals"), by its undersigned attorneys, alleges the following as its complaint in this case:

**NATURE OF THE ACTION**

1.      In March 2018, the President of the United States of America ("the President"), acting pursuant to Section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. § 1862), imposed a 25% *ad valorem* tariff on steel imports. The President's Proclamation recognized that these tariffs could have unintended consequences for U.S. businesses that rely on imports of steel products not otherwise immediately available in the domestic market. Proclamation 9705, *Adjusting Imports of Steel into the United States* (Mar. 8, 2018). The Proclamation therefore expressly directed the Department of Commerce (hereafter "Commerce") to grant exclusions from the Section 232 tariffs to U.S.-based businesses for imported steel products that are not immediately available in sufficient quality or quantity in the United States.

2.      According to Commerce, the reason for exclusions was:

[T]o protect downstream manufacturers that rely on products not produced by U.S. domestic industry at this time. The guiding principle is that, if U.S. domestic

1

industry does not or will not produce a given steel or aluminum product of the quality needed by users in the United States, companies that rely on those products will not pay duties on them.

*Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum*, 83 Fed. Reg. 46,026, 46,038–39 (Sept. 11, 2018).

3. Mirror Metals is a California-based provider of "architectural-grade," flat-rolled stainless steel in a variety of specialized textures and surface treatments such as # 8 non-directional, bright annealed steel, # 4 satin and hairline (the "subject steel"). Mirror Metals employs 13 workers in its Oxnard, California headquarters.

4. Mirror Metals provides the subject steel to architects, fabricators, distributors, and contractors in North America that, in turn, use the steel in specialty projects. These projects have included the LAX International Airport Terminals, 300 North LaSalle in Chicago, Museum of Art and History in Santa Cruz, California, the Treasure Island Casino in Las Vegas, Nevada, and the Aquarium at the Boardwalk in Branson, Missouri. Mirror Metals also supplies the subject steel to automotive, transportation, refrigeration, architectural industries and the like. The subject steel is considered "specialty steel" because of its unique reflective qualities and high gloss, non-directional finishes that are not available in standard flat-rolled stainless steel.

5. Mirror Metal's operation depends upon a reliable, timely and continuous supply of substantial amounts of the subject steel in order to meet the requirements of its varied customers, each of which has its own unique project with specific timeframes.

6. Mirror Metals has consistently sought to source the subject steel from the domestic market; however, domestic producers either do not produce the subject steel or cannot provide the subject steel with the type and/or quality of finish required by Mirror Metal's customers. The subject steel's finish is of particular importance to Mirror Metals because it

provides the steel with a high-gloss and reflective finish that is distinct from standard flat-rolled stainless steel.

7. This case concerns 45 exclusion requests submitted by plaintiff that were denied by Commerce. Forty three exclusions were filed between May 15, 2018 and June 18, 2018 and two were filed between November 19, 2020 and December 2, 2020. The exclusion requests covered primarily four categories of stainless steel products: (1) #8 Non Directional, (2) 430 Bright Annealed, (3) #4 satin and (4) hairline/random swirl. The 45 exclusion requests are listed in **Exhibit 1** under one of the foregoing four categories. These products are hereafter referred to as "the subject steel."

8. Despite substantial evidence documenting the lack of a sufficient quantity or quality of the subject steel in the domestic market, Commerce – after receiving domestic objections from TSA Processing, North American Stainless, and AK Steel Corporation ("AK Steel") – denied each of the 45 exclusions. It did so issuing generic boilerplate decision memos. The decision memos were dated between March 28, 2019 and April 24, 2019 on the earliest 43 exclusion requests, and early 2021 on the most recent two requests. As a result of the denial of the exclusion requests, Mirror Metals paid substantial amounts in Section 232 steel tariffs from which it should have been exempt.

9. In denying Mirror Metal's exclusion requests and sustaining the objections, Commerce undertook no effort to verify the objectors' claims, ignored the conclusive evidence that these companies are unable to produce the subject products in the required quality or required time frame, and failed to provide any reasoned basis for its decisions.

10. Thus, Commerce abandoned the standards established by Proclamation 9705 and the Department's own regulations Commerce's denials of Mirror Metal's exclusion requests were

therefore arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*. ("APA").

11.     The decisions denying Mirror Metal's request are part of a pattern in which Commerce has rotely rejected hundreds of exclusion requests, providing the same pro forma, conclusory decisions, with no reasoning or analysis.

12.     Commerce's improper handling of the exclusion process is so troubling that, in October 2019, the Department's own Inspector General issued a rare warning to Commerce Secretary Wilbur Ross, expressing serious concern that irregularities in the process. Such concern includes apparent undocumented, *ex parte* communications with objectors that "gives the appearance that Department officials may not be impartial or transparent and are potentially making decisions based on evidence not contained in the official record for specific exclusion requests. U.S. Department of Commerce Office of Inspector General, *Management Alert: Certain Communications by Department Officials Suggest Improper Influence in the Section 232 Exclusion Request Review Process*, Final Memorandum No. OIG-20-003-M (Oct. 28, 2019) ("*OIG Management Alert*"), attached as **Exhibit 2**, at 3.

13.     The Inspector General's observations, when combined with Commerce's summary denials of Mirror Metal's exclusion requests, demonstrate that the Department ceded the entire exclusion process to the objectors, without giving any real consideration to the actual record evidence regarding Mirror Metal's requests. Commerce's disregard of its obligation to engage in fair, reasoned decision-making mandates reversal.

## JURISDICTION

14.     This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C.

§ 1581(i)(2) and (4) because it concerns claims against the United States or its agencies arising out of laws concerning "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue" and the "administration and enforcement" of such laws.

## THE PARTIES AND STANDING

15. Mirror Metals imports the subject steel and supplies it to architects, fabricators, distributors and contractors engaged in the construction, automotive and commercial refrigeration industries in the United States.

16. Mirror Metals imported and paid Section 232 Steel tariffs on the subject steel.

17. Mirror Metals has standing to bring this action because it has been adversely affected or aggrieved by agency action within the meaning of APA Section 702, namely Commerce's wrongful denial of Mirror Metal's requests for exclusions from Section 232 steel tariffs. 28 U.S.C. § 2631(i); 5 U.S.C. § 702.

18. Defendant is the United States of America, acting by and through Commerce.

## TIMELINESS OF ACTION

19. A plaintiff must commence an action under 28 U.S.C. § 1581(i) "within two years after the cause of action first accrues." 28 U.S.C. § 2636(i).

20. Mirror Metals contests action taken by Defendant that resulted in the denial of its requests for exclusion from Section 232 steel tariffs.

21. Mirror Metal's claims accrued at the earliest on the date that Commerce first posted notices of its decisions to deny the exclusion requests, which occurred after March 28, 2019.

22. The instant action was filed within two years of the date that Commerce first posted notices of its denial of Mirror Metal's requests for exclusion from Section 232 steel tariffs.

## FACTUAL BACKRGOUND

### A. Statutory and Regulatory Background

23. Section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. § 1862), authorizes the Secretary of Commerce, in coordination with the Secretary of Defense, to conduct an investigation "to determine the effects on the national security of imports" of any articles. Upon completing this investigation, the Secretary must provide the President with a report advising whether the articles under investigation are "being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security." 19 U.S.C. §§ 1862(b)(1)(A), (3)(A).

24. If the President concurs with the Secretary's finding that a threat exists, the President shall "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii).

25. Pursuant to Section 232, on March 8, 2018, President Trump issued Proclamation 9705, imposing additional duties on imports of steel. The Proclamation directed the Secretary of Commerce to grant exclusions from these tariffs if the Secretary determines that any steel product for which an exclusion is requested is not "produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality." *Adjusting Imports of Steel into the United States*, Pres. Proc. No. 9705, 83 Fed. Reg. 11,625, 11,627 (Mar. 8, 2018).

26. On March 19, 2018, Commerce, through its Bureau of Industry and Security ("BIS"), issued an interim final rule (codified at 15 C.F.R. pt. 705, supp. 1) setting forth the circumstances in which the Department would grant a tariff exclusion to directly affected U.S. businesses. Following a notice and comment period, on September 11, 2018, the Secretary supplemented the rules for tariff exclusion requests. *See Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum*, 83 Fed. Reg. 46,026 (Sept. 11, 2018).

27. The regulations adopted by Commerce sets forth the procedures for affected parties to request tariff exclusions. They also provide that a domestic producer may object to any such request if that producer is capable of "immediately" providing the imported product in the United States.

28. The Department's regulations specifies that a product is "not produced in the United States in a sufficient and reasonably available amount" if:

> the amount that is needed by the end user requesting the exclusion is not available immediately in the United States to meet its specified business activities. "Immediately" means whether a product is currently being produced or could be produced "within eight weeks" in the amount needed in the business activities of the user of steel in the United States described in the exclusion request.

Subsection (c)(6)(i) to Supplement 1 to 15 C.F.R. pt. 705.

29. Commerce further defined when a steel product is "not produced in the United States in a satisfactory quality":

> The exclusion review criterion "not produced in the United States in a satisfactory quality" does not mean that the steel needs to be identical, but it does need to be equivalent as a substitute product. "Substitute product" for purposes of this review criterion means that the steel being produced by an objector can meet "immediately" . . . the quality (*e.g.*, industry specs or internal company quality controls or standards), regulatory, or testing standards, in order for the U.S. produced steel to be used in that business activity in the United States by that end user.

Subsection (c)(6)(ii) to Supplement 1 to 15 C.F.R. pt. 705

30. Commerce's regulations plainly and sensibly place the burden on an objector to demonstrate that it can produce the "substitute product" within the requisite timeframe:

> The objection should clearly identify, and provide support for, its opposition to the proposed exclusion, with reference to the specific basis identified in, and the support provided for, the submitted exclusion request. If the objector is asserting that it is not currently producing the steel identified in an exclusion request but can produce the steel within eight weeks (meaning the objector meets the definition of being able to supply the steel "immediately" in order to meet the demand identified in the exclusion request), the objector must identify how it will be able to produce the article within eight weeks. This requirement includes specifying in writing to the U.S. Department of Commerce as part of the objection, the timeline the objector anticipates in order to start or restart production of the steel included in the exclusion request to which it is objecting. The objection should clearly identify, and provide support for, its opposition to the proposed exclusion, with reference to the specific basis identified in, and the support provided for, the submitted exclusion request. If the objector is asserting that it is not currently producing the steel identified in an exclusion request but can produce the steel within eight weeks (meaning the objector meets the definition of being able to supply the steel "immediately" in order to meet the demand identified in the exclusion request), the objector must identify how it will be able to produce the article within eight weeks. This requirement includes specifying in writing to the U.S. Department of Commerce as part of the objection, the timeline the objector anticipates in order to start or restart production of the steel included in the exclusion request to which it is objecting.

Subsection (d)(4) to Appendix to 15 C.F.R. pt. 705.

### B.  Mirror Metals' Requests for Exclusion from the Section 232 Tariffs

31. Between May 14, 2018 and June 18, 2018, Mirror Metals submitted 41 requests for exclusion from the Section 232 tariffs for the subject steel. Another two exclusion requests were submitted between November 19, 2020 and December 2, 2020. All of these exclusion requests are identified in **Exhibit 1**. Mirror Metal's submissions to the Department demonstrated that the subject steel was not available in the United States because no domestic producer could supply Mirror Metals.

32. As noted on the schedule in **Exhibit 1**, the subject steel can be divided into four

categories based upon the finish applied to the stainless steel: (1) #8 non-directional (2) bright annealed, (3) #4 satin and (4) hairline/random swirl.

33. After Commerce accepted Mirror Metal's exclusion requests, a combination of three companies – TSA Processing, AK Steel, and North American Stainless (collectively, the "Objectors") – filed the similar and cursory objections. The Objectors claimed without any support that they either could already manufacture or soon would be able to manufacture the subject steel in the quality and quantity Mirror Metals needed within the requisite timeframe.

**1. The subject steel is "not produced in the United States in a sufficient and reasonably available amount"**

**#8 Non-Directional Steel**

34. Only one company – TSA Processing – objected to Mirror Metal's exclusion requests for the subject steel with a #8 non-directional finish. At the time plaintiff submitted its exclusion requests TSA Processing was not capable of producing the #8 non-directional finish and therefore was unable to supply the quantity requested within 8 weeks.

35. TSA Processing stated in a supporting cover letter dated June 20, 2018 that it expected to be operational "in the next few weeks." Thus, by its own admission, TSA Processing's assertion of being able to produce the subject steel in 21 days was speculative at best.

36. Mirror Metals filed rebuttals to TSA Processing's objections noting the foregoing inconsistency, and noting that TSA would not be able to produce the requested quantity with a single polishing line. Mirror Metal's rebuttal also included an August 30, 2018 e-mail (i.e., over two months after the objection filings) in which TSA Processing conceded that it would not even have the necessary stainless steel base material on which the #8 non-

directional finish would be applied for another four weeks at best, let alone the capability to produce large quantities of high-quality steel within eight weeks.

37.     TSA Processing did not file surrebuttals to Mirror Metal's rebuttals, nor did it provide Commerce any objective evidence of its actual ability to produce the product at all, let alone in the quantities and time frames required by Mirror Metals.  The absence of a surrebuttal is an indication that no such evidence existed and TSA could not establish "immediate" availability of the subject product in the United States.

38.     Because TSA Processing did not have the ability to provide the subject steel within eight weeks, it could not provide the steel "immediately" as that term is defined by Supplement 1 to 15 C.F.R. Part 705 and, therefore, the subject steel in a #8 non-directional finish was not produced in the United States in a sufficient and reasonably available amount.

### Bright Annealed Finish

39.     Three companies filed objections to Mirror Metal's exclusion requests for the subject steel with a bright annealed finish: TSA Processing, AK Steel, and North American Stainless.

40.     AK Steel stated in its objections that it required 90 days to produce the subject steel with a bright annealed finish; therefore, by its own admission, AK Steel did not have the ability to produce the subject steel "immediately" as that term is defined by Supplement 1 to 15 C.F.R. Part 705.

41.     North American Stainless stated in its objections that it required 60 days to produce the subject steel with a bright annealed finish; therefore, by its own admission, North American Stainless did not have the ability to produce the subject steel "immediately" as that

term is defined by Supplement 1 to 15 C.F.R. Part 705.

42. TSA Processing stated in its objections that it required 21 days to produce the subject steel with a bright annealed finish; however, TSA Processing is not a steel mill but is instead a steel polisher. Bright annealed steel is not a polished product; it is particular type of steel that is made by steel mills. Thus, TSA Processing could never manufacture this product and their representations to Commerce about its ability to produce and timely deliver were inaccurate at best. TSA had no right to object to these exclusion requests because TSA is not a producer of 430 BA steel.

43. Mirror Metals submitted rebuttals to TSA Processing's objections. Mirror Metals specifically noted that it visited TSA Processing's facility on August 21, 2018 and TSA Processing conceded it could not produce the bright annealed steel at issue because it was a coil center and did not have the equipment required to produce 430 BA steel. Mirror Metal's rebuttal also included an e-mail from TSA Processing summarizing the visit and noting that it had placed an order with a steel mill for buffing quality steel with a bright annealed finished. This e-mail makes clear that TSA Processing could not produce the bright annealed steel itself and had to source it from elsewhere. Again, TSA Processing did not file surrebuttals to Mirror Metal's rebuttals and did not provide Commerce with any evidence of its ability to produce the subject steel.

44. Because TSA Processing did not have the ability to produce the subject steel, let alone within eight weeks, it did could not provide the steel "immediately" as that term is defined by Supplement 1 to 15 C.F.R. Part 705.

### #4 Satin Finish

45.     Only one company – North American Stainless – objected to Mirror Metal's exclusion for the subject steel in a #4 Satin finish.

46.     North American Stainless stated in its objections that it required 60 days to produce the subject steel with a #4 Satin finish; therefore, by its own admission, North American Stainless did not have the ability to produce the subject steel "immediately" as that term is defined by Supplement 1 to 15 C.F.R. Part 705.

47.     Furthermore, three days after the rebuttal period closed on this exclusion request, North American Stainless provided the e-mail attached as **Exhibit 3** stating that the actual timeline on the subject steel with a #4 Satin finish was, in reality, between 84 and 98 days.

### Hairline and Random Swirl

48.     Only one company – TSA Processing – objected to Mirror Metal's exclusion requests for the subject steel in hairline and random swirl finish.

49.     TSA Processing stated in its objections that it required 21 days to produce the subject steel with a hairline or random swirl; however, TSA Processing also stated in a supporting cover letter that it would be operational "in the next few weeks" thereby again conceding that the 21 day timeline was speculative at best.

50.     Furthermore, in its rebuttal to TSA Processing's claims regarding bright annealed steel, Mirror Metal's provided a subsequent e-mail where TSA Processing conceded that – like the #8 non-directional steel – it would not have the base stainless steel for another four weeks at least.  Again, TSA Processing did not file surrebuttals to Mirror Metal's rebuttals.

51.     Because TSA Processing did not have the ability to provide the subject steel

within eight weeks, it did could not provide the steel "immediately" as that term is defined by Supplement 1 to 15 C.F.R. Part 705.

### 2. The subject steel is not "produced in the United States in a satisfactory quality"

52. Even if the Objectors had the capacity to provide the subject steel in the timeframes required by Commerce's regulations (they do not), none of these companies have been able to provide Mirror Metals with even an acceptable sample let alone a commercial amount of the goods.

53. The submissions made by Mirror Metals in the exclusion process included ample evidence of these quality deficiencies including both supporting letters from customers explicitly stating that the objectors could not provide the subject steel in a satisfactory quality and e-mail communications with the objectors themselves conceding the quality issues.

54. TSA Processing readily stated in an e-mail communication, which Mirror Metals included in all of its rebuttals, that the company did not even have the raw stainless steel on which the four finishes could be applied let alone the expertise and capacity to provide Mirror Metals with the quantities of steel it required. Furthermore, TSA Processing is a steel polisher and, as such, is not capable of producing steel with a bright annealed finish.

55. AK Steel and North American Stainless likewise was never able to provide Mirror Metals with a substitute product that met the company's requirements.

56. North American Stainless in the e-mail attached as Exhibit 3 stated it could provide a product in a #4 finish with a roughness average ("RA") of between 6 and 16. RA measures the smoothness of the finished steel, which in turn dictates the steel's color (a steel with a higher RA has a lighter color). Mirror Metals, however, specified in its exclusion request

that it required a # 4 *satin* finish, which is understood in the steel industry to have an RA of between at least 12 and 16.

57.     The Objectors' steel, therefore, does not qualify as a "substitute product" under Commerce's regulations.  *See* Subsection (c)(6)(ii), Supplement 1 to 15 C.F.R. pt. 705.

### C.     Commerce's Denial of Mirror Metal's Exclusion Requests

58.     Mirror Metals filed rebuttals to each objection with evidence substantiating it claims that the subject steel was not available in a "sufficient and reasonably available amount" and/or in a "satisfactory quality."   Nevertheless, Commerce denied each of the 45 exclusions at issue.

59.     Commerce denied  11 of the 45 exclusion requests, at least in part, on the grounds that "BIS finds that the above-captioned request for relief ('exclusion request') has not met the requirements for consideration as a 'complete submission' under paragraph (h) of Supplement No. 1 to 15 CFR Part 705. Customs and Border Protection (CBP) has advised BIS that the product description is inconsistent with the claimed classification under the Harmonized Tariff Schedule of the United States…."  Significantly, Commerce never informed Mirror Metals that it believed the HTSUS subheading was incorrect and instead denied the exclusion almost one year later.

60.     An exclusion request has a data field in which the requestor identifies the 10-digit subheading for the product under the Harmonized Tariff Schedules of the United States (HTSUS).

61.     The denial of an exclusion request due to a reference to an allegedly incorrect HTSUS subheading was arbitrary, capricious and unreasonable.  Commerce expressly allows

requestors to re-submit exclusion requests to correct alleged errors in HTSUS subheadings with the correction deemed applicable to the original exclusion request submission date. See, *232 Exclusion Process Frequently Asked Questions, Department of Commerce*, June 19, 2019 at 25.

62. According to Commerce's regulations, it should have decided each exclusion request no later than 106 days after submission. *See* Subsection (h)(3)(i), Supplement 1 to 15 C.F.R. pt. 705. Nevertheless, Commerce took almost one year to deny Mirror Metal's requests. When it did finally issue its decisions, Commerce simply recited, verbatim, boilerplate rejection language in each of the 45 requests – citing no evidence and providing no reasoning whatsoever to support its conclusions.

63. Commerce's denials each parroted the following generic, conclusory language as a basis for its decisions:

> In examining whether the relevant steel article is produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality, ITA recommends finding, based on all of the evidence presented, that the product referenced in the above- captioned exclusion request is produced in the United States in a sufficient and reasonably available amount and of a satisfactory quality, and recommends denying the request for an exclusion.
>
> BIS accepts ITA's recommended findings as to the domestic availability of the product, and finds that no overriding national security concerns require that this exclusion request be granted notwithstanding domestic availability.

64. This rote, unreasoned denial of Mirror Metal's exclusion requests without any explanation or any consideration of the evidence is, on its face, arbitrary and capricious.

65. Commerce's decisions denying Mirror Metal's requests are part of a broader pattern in which the Department has rejected hundreds of exclusion requests by providing the same *pro forma*, conclusory explanation – completely devoid of reasoning or analysis. The one common denominator that permeates all these cases is that large competitors, including AK

Steel, filed objections to the requests. In fact, according to a study conducted by the MERCATUS CENTER at George Mason University, approximately 99% of steel tariff exclusion requests were denied when large companies such as AK Steel filed an objection. *See* Christine McDaniel & Danielle Parks, *Tariff Exclusion Requests: A One-Year Update*, MERCATUS CENTER (Apr. 11, 2019), www.mercatus.org/bridge/commentary/tariff-exclusion-requests-one-year-update, attached as **Exhibit 4**, at 1 ¶ 2, 3.

66. The pattern that has emerged is so troubling that it led Commerce's Inspector General to warn the Secretary of Commerce about improper influences in the process and the appearance of impropriety presented by the Department's conduct. *See OIG Management Alert* attached as **Exhibit 2**.

67. The irregularities identified by the Inspector General included Commerce's reconsideration of approved exclusion requests "at the request of an objector," and the Department's revision of a review criterion "within days of receiving a communication from an objector regarding the criterion." *Id*. at 2-3. The Inspector General also noted that Commerce officials had conducted undocumented, off-the-record *ex parte* communications with some objectors. *Id*. at 3. The Inspector General therefore expressed serious concern that the exclusion process lacked transparency and impartiality:

> This gives the appearance that Department officials may not be impartial or transparent and are potentially making decisions based on evidence not contained in the official record for specific exclusion requests.

*Id*.

68. The Inspector General's observations strongly corroborate what is otherwise evident from the record – Commerce's decisions were based on the will of the objectors, rather than any reasoned analysis of the actual record evidence regarding Mirror Metal's exclusion

requests.

69.  Commerce's denials of Mirror Metal's exclusion requests demonstrate that Commerce acted without regard to record evidence and made decisions on plaintiff's exclusion requests that were arbitrary.   For example, attached as **Exhibit 5** are screen-prints of the two exclusion requests (ID No. 85572 and ID No. 145084) both of which covered the same product (i.e., stainless steel in 430 alloy with a bright annealed finish in 16 gauge steel measuring 12.5" by 30").  This exhibit also includes Commerce's decision letter for each exclusion.   Commerce concluded in exclusion request ID No. 85572  where North American Stainless objected:

> In examining whether the relevant steel article is produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality, International Trade Administration ("ITA") recommends finding, based on all of the evidence presented, that the product referenced in the above-captioned exclusion request is produced in the United States in a sufficient and reasonably available amount and of a satisfactory quality, and recommends denying the request for an exclusion

By comparison, Commerce concluded as follows on exclusion request ID No. 145084, to which no objections were filed:

> Based on BIS's review of the evidence presented, and the absence of objectors, BIS finds that the product referenced in the above-captioned exclusion request is not produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality.

These decisions demonstrate that Commerce has ceded the entire exclusion process to domestic objectors and evidence the Department's disregard of its obligation to engage in fair, reasoned decision-making.

70.  In short, it is plain that in denying Mirror Metal's requests Commerce ignored uncontroverted evidence submitted by Mirror Metals, and without: (a) demanding proof from the objectors to rebut the evidence Mirror Metals submitted; (b) developing and adhering to a process  designed to ascertain the truth regarding the objectors' unsupported objections; and  (c)

17

providing any reasoned basis for its decisions.

## STATEMENT OF CLAIMS

### COUNT I
### (APA, 5 U.S.C. §§ 701-706)

71. Mirror Metals hereby incorporates Paragraphs 1-70 above as fully restated herein.

72. Mirror Metals submitted 45 requests for exclusion from the Section 232 tariffs for flat rolled stainless steel products as summarized in **Exhibit 1.** Commerce denied each of the exclusion requests.

73. Applying the standards set forth in Commerce's regulation (Supplement 1 to 15 C.F.R. pt. 705) to the evidence in the record, the only reasonable conclusion that the Department could properly have reached with regard to these exclusion requests was that Mirror Metals cannot obtain the subject steel in the U.S. market in a sufficient quantity or quality, on a timely basis to replace the steel it currently imports. Accordingly, Mirror Metals was and remains entitled to the requested tariff exclusions.

74. Commerce's decisions denying Mirror Metal's requests for exclusions from the Section 232 steel tariffs, without any evidentiary basis and without any expressed, reasoned basis for doing so, were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. They were rendered "without observance of procedure required by law," and thus must be held "unlawful and set aside" by this Court. *Id*. §§ 702, 706.

### REQUEST FOR RELIEF

WHEREFORE, Mirror Metals respectfully requests that this Court enter judgment as

follows:

(i) Declaring that Commerce's denials of Mirror Metal's exclusion requests were arbitrary and capricious or otherwise unlawful in violation of the APA (5 U.S.C. §§ 701 *et seq.*);

(ii) Declaring that Mirror Metals is entitled to the requested exclusions from the Section 232 steel tariffs, in accordance with Proclamation 9705 and Appendix to 15 C.F.R. and ordering Commerce to instruct U.S. Customs and Border Protection to refund the Section 232 tariffs previously paid by Mirror Metals;

(iii) Alternatively, remanding the matter to Commerce for proper treatment and consideration, in accordance with the requirements of the APA; and

(iv) Awarding Mirror Metals such other relief as this Court deems just and proper.

Respectfully submitted:

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

  /s/ Erik D. Smithweiss
Erik D. Smithweiss
Jordan C. Kahn*

707 Wilshire Blvd., Suite 4150
Los Angeles, CA 90017-3605
(213) 624-1970
-and-
*1201 New York Ave., N.W., Suite 650
Washington, D.C. 20005-3917
(202) 661-7784

*Counsel for Plaintiff Mirror Metals Inc.*

Dated: March 26, 2021

11043371_1